## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| CHARLES DAUGHERTY, | |
| Plaintiff, | CIVIL ACTION NO.: 4:22-cv-245 |
| v. | |
| CITY OF POOLER, | |
| Defendant. | |

### O R D E R

Plaintiff Charles Daugherty sued the City of Pooler (the "City") under the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. (the "ADA"), alleging that he was discriminated and retaliated against because of his disability.  (Doc. 1.)  Presently before the Court is the City's Motion for Summary Judgment, (doc. 21), in which it argues, among other things, that Plaintiff has failed to raise a genuine issue of material fact on either claim because he is not a qualified individual under the ADA and he has not presented evidence that he requested a reasonable accommodation, (doc. 21-1).  Plaintiff filed a Response, (doc. 25), and the City filed a Reply, (doc. 27).  For the reasons below, the Court **GRANTS** Defendant City of Pooler's Motion for Summary Judgment.  (Doc. 21.)

### BACKGROUND

### I.    Plaintiff's Employment Background

Plaintiff Charles "Chad" Daugherty began working for the City of Pooler Police Department ("PPD") on September 12, 2018, as a patrol officer.  (Doc. 25-1, p. 1.)  He worked one year as a patrol officer, and then worked roughly two years in the traffic unit until his

employment separation on August 4, 2021.  (Id.)  Prior to his employment at PPD, from 2009 to 2018, Plaintiff worked for the City of Columbus Police Department ("CPD") as a motorcycle officer on the traffic unit.  (Id.)  In this role, his primary duties were traffic enforcement and severe and fatal car crash investigations.  (Id.)  While employed at CPD, Plaintiff experienced issues with anxiety and vertigo.  (Id.)

In February or March 2021, while employed at PPD, Plaintiff began experiencing anxiety issues again.  (Id. at p. 2.)  Plaintiff recalls arriving to the scene of an accident where he began shaking and experiencing difficulty breathing.  (Id.)  Plaintiff had been taking prescribed medication for anxiety and panic disorders since he was employed by CPD.  (Id. at p. 3.)  While Plaintiff had continued to experience some anxiety and shaking before this incident, his reaction to the crash that day led him to seek help.  (Id. at p. 2.)

The last day Plaintiff worked at PPD was on April 26, 2021.  (Id. at p. 3.)  On April 30, 2021, Plaintiff made a request to Lt. Tyson for two nights off because his anxiety was acting up, which Tyson granted.  (Id.)  On May 3, 2021, Plaintiff told Sgt. Griner that something was not right, and he needed to figure out what was going on.  (Id.)  Plaintiff told Griner that he was seeking medical treatment for anxiety through his doctor, that he had been experiencing anxiety on routine traffic calls, and that he had taken some days off due to his anxiety.  (Id.)  Plaintiff also told Tyson and Griner that his anxiety was starting to affect his work.  (Id.; see doc. 21-3, p. 10.)  Plaintiff was offered help through the Employee Assistance Program.  (Doc. 25-1, p. 3; doc. 21-4, p. 5.)  Plaintiff then asked to speak with PPD Chief Brown.  (Doc. 25-1, pp. 3–4.)  Plaintiff expressed to Brown that he was having some anxiety issues he needed to get checked out, and he recalled that Brown could see that he was visibly shaking.  (Id. at p. 4.)  Plaintiff told Brown, "Chief, I don't know what's going on[,] but I need to reach out for help," to which Brown

replied, "Go ahead."  (<u>Id.</u>)  Plaintiff told Brown that he did not want to lose his job and that he loved his job.  (<u>Id.</u>)  Plaintiff recalls that Brown said, "[T]here's ways around it," but Plaintiff did not know what Brown meant by that.  (<u>Id.</u>)  Plaintiff further recalls that Brown was "very quick and to the point."  (<u>Id.</u>)

On May 4, 2021, Plaintiff informed Tyson that he had spoken with his therapist, and she recommended that he take some time off and that she would be writing a letter for him.  (<u>Id.</u> at p. 4.)  Plaintiff stated that he did not feel he could come back to work until he got his blood work back and a recommendation from his doctors.  (<u>Id.</u>)  Tyson then told Plaintiff to take care of himself and let him off.  (<u>Id.</u>)

## II.   Plaintiff's Medical Leave and Correspondence with the City

On May 14, 2021, Plaintiff sent the City's Human Resources Director, Caroline Hankins, an executed Family and Medical Leave Act ("FMLA") Certification of Health Care Provider for Employee's Serious Health Condition form (the "FMLA Certification"), which was signed and completed by his therapist, Marlene Maryanopolis.  (<u>Id.</u> at pp. 4–5.)  On the FMLA Certification, Maryanopolis checked the box "yes" to the question, "Is the employee unable to perform any of his or her job functions due to conditions?"  (<u>Id.</u>; <u>see</u> doc. 21-4, p. 9.)  Plaintiff agreed with the opinion and felt that when he was going through treatment, he was unable to perform his job. (Doc. 25-1, p. 5.)

On the FMLA Certification, Maryanopolis wrote that Plaintiff had been "diagnosed with Post Traumatic Stress Disorder [("PTSD")] due to repeated exposure to complex trauma."  (<u>Id.</u> at p. 5; <u>see</u> doc. 21-4, p. 9.)   She noted his symptoms included "involuntary and intrusive memories, racing thoughts, efforts to avoid triggering stimuli, negative cognitions of others leading to excessive fear and feelings of dread, fear, guilt and depression," as well as

"physiological symptoms of elevated heart rate, shortness of breath, muscle tension and sleep disturbance."  (Doc. 25-1, p. 5; see doc. 21-4, p. 9.)  She later stated that

> It is my opinion that [Plaintiff's] condition and current symptoms prevent him from conducting his duties effectively as a law enforcement officer.  He would benefit greatly from a leave of absence from his duties to engage in treatment that will allow him to tend to his mental health needs and develop skills to manage his symptoms.

(Doc. 25-1, p. 5; see doc. 21-4, p. 10.)  Maryanopolis also noted the "estimate[d] . . . ending date[] for the period of incapacity" was July 6, 2021.  (Doc. 21-4, p. 10.)  Plaintiff agreed that it was an estimate.  (Doc. 25-1, p. 6.)

On May 17, 2021, Plaintiff applied for short-term disability benefits from Lincoln National Life Insurance Company ("Lincoln"), which he received.  (Id.)  On May 19, 2021, Maryanopolis filled out a form for Lincoln entitled "Short Term Disability Claim Form Physician's Statement."  (Id.; see doc. 21-4, pp. 14–15.)  When asked to provide the date the "patient [will be] able to return to work full-time[,]" Maryanopolis left the response line blank, but in the space below, associated with the question "[i]f a specific date is unavailable, please provide a date range you expect a fundamental or marked change," she wrote August 23, 2021 to September 20, 2021.  (Doc. 21-4, p. 15.)  Soon after, Plaintiff began seeing a new psychiatrist and no longer saw Maryanopolis.  (Doc. 25-1, p. 6; see doc. 21-3, p. 14.)

On July 6, 2021, Plaintiff believed he was still unable to return to work due to his condition, because he was still undergoing treatment.  (Doc. 25-1, p. 6.)  Throughout Plaintiff's FMLA leave, he spoke with Tyson about three times a week.  (Id. at p. 7.)  Plaintiff was not angry that Tyson contacted him because they had a great relationship.  (Id.)  On July 9, 2021, Tyson told Hankins, "Every time I talk to [Plaintiff], he tells me that the doctor wants him to stay out longer.  He says he wants to come back but that the doctor doesn't think that he's ready yet."  (Id.; see doc. 21-4, p. 19.)

On July 15, 2021, Hankins emailed Plaintiff to "check in" and inquired, "[h]ow is everything going?"  (Doc. 25-1, p. 7; see doc. 21-4, p. 20.)  Plaintiff responded,

> It's going, trying to take it day by day honestly.  Some days are good and some not so much.  This crap is no joke, never would of thought I would be the one with this issue.  Thank you for checking in. I hope to be back to work as soon as possible.

(Doc. 25-1, p. 7; see doc. 21-4, p. 20.)  On August 10, 2021, Hankins and Plaintiff exchanged another thread of emails:

> (2:00 PM, from Hankins) Hey Daugherty, I wanted to check to see how your appointments went last week.  Thanks!
>
> (3:18 PM, from Daugherty) Hey, I'm seeing a psychiatrists [sic] in regards to this issue.  He has prescribed an increase of my current medication and another medication as well.  The insurance company is obtaining copies of his notes to go along with therapist notes.
>
> (3:22 PM, Hankins) Okay thanks no release?
>
> (3:24 PM, Daugherty) Nothing as of right now.
>
> (3:28 PM, Hankins) Okay as I mentioned over the phone we will have to move forward with the term based upon FMLA expiration according to our policy.  We will start the paperwork process.  In the mean time stay in touch should your physician allow[] you to return.  Make sure your physician provides the additional information for your long term disability.
>
> (3:47 PM, Daugherty) I'll stay in touch with any information that I receive.  Hopefully I can come back soon, I do miss it.
>
> (3:49 PM, Hankins) Okay thanks, take one day at a time.

(Doc. 25-1, pp. 7–8; see doc. 21-4, pp. 22–24.)  Plaintiff understood that Hankins was asking him for a release to go back to work.  (Doc. 25-1, p. 8; see doc. 21-3, p. 17.)  Plaintiff had talked with his new psychiatrist about returning to work, but as of the date of this email exchange, he knew that he had not been released to return to work.  (Doc. 25-1, p. 8; see doc. 21-3, p. 17.)  According to Plaintiff, the City had no reason to think that he had been released to return to work by any medical professional.  (Doc. 25-1, p. 8; see doc. 21-3, p. 16.)

At some point, Plaintiff believes he asked Hankins about working in a light duty position, and Hankins told him that there were no light duty positions available.  (Doc. 25-1, p. 9; <u>see</u> doc. 21-3, pp. 17–18.)  Hankins, however, denies that Plaintiff ever requested a light duty position or otherwise asked for any type of accommodation.  (Doc. 21-7, p. 19.)  While Plaintiff expressed a desire to return to work, he never asked Hankins to hold his job open until he was released.  (Doc. 25-1, p. 10; <u>see</u> doc. 21-3, p. 18.)

The City maintained an Employee Handbook, dated April 2019 (the "Handbook"), which was in effect at all relevant times.  (Doc. 25-1, p. 10.)  Under the section entitled "PTO," the Handbook provides: "Employees that miss work due to an illness or injury and who have notified their supervisor(s) of the absence may be required to present a doctor's release to the Human Resources Department that permits them to return to work."  (<u>Id.</u>)  According to the City's practice and procedures, Hankins relied on this provision and required Plaintiff to present a doctor's release to return to work after his FMLA leave was exhausted.  (<u>Id.</u>; <u>see</u> doc. 21-5, p. 2.)

Plaintiff admits that it was up to a doctor to decide whether he was fit for duty and whether it would be prudent  to return to work.  (Doc. 25-1, pp. 12–13.)  Plaintiff never reached out to Hankins regarding a release following his employment ending with the City.  (<u>Id.</u> at p. 13.)  Plaintiff was given all the FMLA leave to which he was entitled by the City, however, Hankins did state that Plaintiff had remaining paid time off ("PTO").  (<u>Id.</u>; <u>see</u> doc. 21-7, p. 15.)  Plaintiff's separation notice listed "the reason for separation" as "FMLA exhausted[.]"  (Doc. 25-1, p. 13.)

Right after Plaintiff's email exchange with Hankins on August 10, 2021, Plaintiff and Captain Bogden exchanged a chain of text messages:

> (3:52 PM, Bogden) This sucks but "Should your physician allow you to return" sounds hopeful.  One thing at a time. What's important now is you get to 100%[.]
>
> (3:52 PM, Daugherty) It's just frustrating.
>
> (3:55 PM, Bogden) No doubt[.]  How are the meds working?
>
> (3:56 PM, Daugherty) I just started the klonopin two days ago.  I was really nervous about taking it.  So I'm letting it get in my system.  Nothing drastic yet[.]
>
> (4:03 PM, Bogden) Ten four[.]   Follow doctor[']s advice, don't miss any appointments, and you'll be back soon[.]
>
> (4:04 PM, Daugherty) I do miss it[.]
>
> . . . (4:14 PM, Bogden) We need you back bo[.]
>
> (4:15 PM, Daugherty) I wanna be back.  Wish I could work tonight honestly. Hopefully in another week or two this medication will be full[y] operational.
>
> (4:17 PM, Daugherty) I know it takes a couple weeks to get in your system.

(Doc. 25-1, p. 11.)  Plaintiff admits that he was not telling Bogden that he could return to work on a certain date and did not tell Bogden a date when he would return.  (Doc. 25-1, pp. 11–12; see doc. 21-3, p. 20.)  According to Plaintiff, on the day his employment with the City ended, Bogden stated the City would not hire him back because he was a "liability."  (Doc. 25-1, p. 12; doc. 21-3, p. 22.)  Bogden, however, denies ever stating that Plaintiff would not be hired back or that he was a liability.  (Doc. 21-8, p. 5.)  Bogden had no ability to hire or fire, make medical accommodations, or grant medical leave.  (Doc. 25-1, p. 13.)

On October 5, 2021, around two months after his employment with the City ended, Plaintiff had lunch with Bogden.  Plaintiff believed that Bogden had invited him out to check in out of a concern for him.  (Id. at p. 14.)  Bogden thought if Plaintiff could get the required

doctor's release, make his appointments, follow his doctor's advice, then he could return to work.  (Id.)  Plaintiff told Bogden that he was ready to come back.  (Id.)

After the lunch, Bogden spoke with Hankins.  According to Bogden, Hankins said she did not think it was a good idea for Plaintiff to return.  (Id.)  Bodgen stated he did not understand why it was not a good idea.  (Doc. 21-8, p. 5.)  Hankins, however, denies saying it was not a good idea and instead recalls telling Bogden that the City must have a full release from Plaintiff's treating physician, and that she could not authorize someone to return without a medical release if they were out on medical leave.  (Doc. 21-7, p. 16.)  Bodgen then texted Plaintiff, "[Human Resources] wants to know 'are you seeing your treating physician currently?'"  (Doc. 25-1, p. 15.)  Plaintiff stated that he was.  (Id.)

At that point, Plaintiff still did not have a release to return to police work by the psychiatrist.  (Id.)  Plaintiff believed that he "probably could have gotten [a release]," but stated, "I was already terminated so what's the point, you know.  At that point I'd had it with Pooler." (Id.)  Plaintiff stated that he would have loved to come back to "to the job that [he] loved" because he worked in a tight-knit group with great supervisors, but that he was depressed and "was just in a really, really bad spot during this time in [his] life right there."  (Id. at pp. 15–16.)

On October 19, 2021, Plaintiff asked Bogden to review a draft letter he was composing to send to the PPD Police Chief.  (Id. at p. 16.)  Plaintiff told Bogden, "I want to come back don't get me wrong[,] [b]ut I want it to benefit me too."  (Id.)  Plaintiff does not know what he meant by that statement.  (Id.)  Plaintiff no longer has access to the alleged letter and does not remember what it was.  (Id.)  He thinks that he sent it and that Bogden may have reviewed it. (Doc. 21-3, p. 23.)

Plaintiff received long-term disability ("LTD") benefits before and after his employment ended.  (Doc. 25-1, p. 16.)  In a letter from Lincoln on September 20, 2021, regarding LTD benefits, Plaintiff was instructed to notify Lincoln immediately if he received other sources of income, but he cannot honestly say that he let them know of earnings he began making as an Uber driver.  (Id.)  On October 20, 2021, Plaintiff sent Lincoln psychiatric records in connection with his LTD benefits.  (Id. at pp. 16–17.)  According to these records, as of October 12, 2021, Plaintiff's medication was still being adjusted and increased and Plaintiff had not been released to work.  (Id. at p. 17.)

Plaintiff admits that he never asked his psychiatrist to release him to return to work as a police officer.  (Id.; doc. 21-3, p. 25.)  While he believes he is able, he acknowledges that it would still be up to a doctor to determine whether he is able to perform the essential duties of police officer.  (Doc. 21-3, pp. 25–26.)  He does not know at what point he would have been able to perform the job of a police officer.  (Id. at p. 26.)  Since his employment with PPD was severed, Plaintiff has not applied for police work because he started a new job on December 28, 2021, through which he earned over $70,000 last year.  (Doc. 25-1, p. 17.)  When he worked for PPD, he earned $50,000.  (Id.)

Plaintiff stopped receiving LTD benefits in October 2021, because he did not turn in documents, and he started focusing on trying to make money.  (Id. at pp. 17–18.)  At the time he responded to the Motion for Summary Judgment, he believed he would earn $70,000–90,000 in 2023 through the job he was then working.  (Id.)  Plaintiff still suffers from PTSD and depression, but it is not disabling.  (Id.)

### III.   Ian Kenny's Employment at PPD

In February 2022, about six months after Plaintiff's employment termination, officer Ian Kenny was diagnosed with a serious illness and, after it became harder to perform his patrol job, he asked his chain of command if there was something he could do while waiting for surgery. (Id. at p. 18.)  Kenny never presented a doctor's note limiting his ability to work.  (Doc. 21-9, p. 9.)  Kenny was reassigned from patrol officer to a lighter duty criminal investigation division job for about two weeks, from the end of March to April 8, 2022.  (Doc. 25-1, p. 18.)  Kenny then went out on FMLA leave.  (Id.)  Kenny ultimately resigned, and, when he was later ready to return to work, Hankins required him to bring a letter from his physician releasing him to work. (Id. at pp. 18–19; see doc. 21-9, pp. 5–6.)  Kenny submitted this letter twice and was cleared to return to work at PPD as a patrol officer in November 2022.  (Doc. 25-1, pp. 18–19; see doc. 21-9, pp. 6–7.)

### IV.   Procedural History

Plaintiff filed suit against the City on October 21, 2022, alleging claims for discrimination and retaliation under the ADA.  (Doc. 1, pp. 7–11.)  Plaintiff also seeks punitive damages and attorney's fees as part of his claims.  (Id. at p. 11.)  The City filed the at-issue Motion for Summary Judgment, arguing, among other things, that Plaintiff was not a "qualified individual" under the ADA, that he never requested a reasonable accommodation, and that the City terminated his employment because he exhausted his FMLA leave and never obtained a release to work.  (See generally docs. 21, 21-1.)  Plaintiff filed a Response, (doc. 25), and the City filed a Reply, (doc. 27).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  The moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove its case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most

favorable to the nonmoving party.  <u>Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.</u>, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing <u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Id.</u> (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence.  <u>Reese v. Herbert</u>, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

### I.  ADA Discrimination

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000) (quoting 42 U.S.C. § 12112(a)).  To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) he is disabled; (2) he was a 'qualified individual' at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability."  <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1255 (11th Cir. 2001) (quoting <u>Reed v. Heil Co.</u>, 206 F.3d 1055, 1061 (11th Cir. 2000)).

The parties do not dispute that Plaintiff has a disability for purposes of the ADA.  (<u>See</u> doc. 21-1, p. 12 ("Post-traumatic stress disorder is a disability under the ADA.") (quoting

Mastaw v. W. Fla. Med. Ctr. Clinic, No. 22-012202, 2023 WL 5426757, at *3 (11th Cir. Aug. 23, 2023))); see 29 C.F.R. § 1630.2(j)(3)(iii).  Rather, the City challenges Plaintiff's claims that he was a qualified individual and that he was discriminated against.

### A.     Whether Plaintiff Was a Qualified Individual

The City first argues that Plaintiff cannot make out a prima facie case of discrimination because he was not a "qualified individual" under the ADA.  (Doc. 21-1, pp. 12–19.)  "A 'qualified individual with a disability' is an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)).  "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform."  Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007) (internal quotations omitted).  Plaintiff has failed to show that he was a "qualified individual" for purposes of the ADA because he has not shown that he could do the essential functions of the job.

Plaintiff admits that he was unable to perform his job under his condition at the time he took his leave of absence, and he specifically admits that his condition was affecting his ability to work at accident scenes.  (See doc. 21-3, p. 12 (agreeing that he was unable to work "[a]t that time, while going through treatment"); doc. 25-1, p. 3 (stating that his anxiety was affecting his work); doc. 21-4, p. 9 (FMLA Certification stating that Plaintiff was unable to perform job functions).)  He also admitted that, at the time his employment ended, he had not been cleared by a physician to return to work, was still adjusting his medications, and was still unsure if he would have been able to perform his job.  (See doc. 25-1, pp. 16–17; doc. 21-3, pp. 25–26.)  Plaintiff has not presented evidence that his condition had significantly improved or that he was somehow

more qualified to perform his duties at any point during his leave of absence up to his employment termination.

In short, Plaintiff admits he took a leave of absence because his condition rendered him unable to perform his job, and he has presented no evidence that this condition improved or that the City was aware of any improvement.  By Plaintiff's own admissions, he has failed to show that he a qualified individual in his condition.  See Groover v. Fayette Cnty., No. 3:17-CV-200-TCB, 2018 WL 9490350, at *2 (N.D. Ga. Sept. 17, 2018) (regardless of plaintiff's subjective belief that she could return to work, she had not shown she had been cleared to return to work where her "doctors had represented weeks before her termination that she could not work and had advised her to stop working" and she presented no evidence that "their opinions changed or were not accurate").

In his Response, Plaintiff seems to argue that he was a qualified employee because "[p]rior to his termination, . . . he was able to perform the essential functions of his job," and "[a]t no point did [he] indicate . . . that he could not perform the essential functions of his job." (Doc. 25, p. 5.)   In support, Plaintiff relies on testimony of others concerning his job performance *before* his leave of absence, but this bears no weight on whether he was qualified to perform the job *after* he experienced an episode of anxiety which led to his leave of absence. See Henry v. State Farm Fire & Cas. Co., No. 118CV005907MLBLTW, 2020 WL 4550936, at *18 (N.D. Ga. May 20, 2020) ("The mere fact that Plaintiff worked . . . for years *before* his hospitalization and diagnoses . . . is not evidence that he could perform the essential functions of that job *after* he had the condition."), *report and recommendation adopted*, No. 1:18-CV-05907, 2020 WL 6482986 (N.D. Ga. Sept. 1, 2020); Heard v. City of Union City, No. 1:15-cv-2228-MHC-JKL, 2017 U.S. Dist. LEXIS 199548, at *26 (N.D. Ga. May 23, 2017) (rejecting argument

that Plaintiff "demonstrated that he can perform the essential functions of a police officer because he had been performing the job without incident . . . before he failed the fitness test").

Plaintiff also argues that his condition only related to his ability to respond to accidents, and his duties related to responding to accidents were "only minute duties compared to the long list of other duties on Defendant's major duties list." (Doc. 25, p. 8.) Yet the duties associated with accident response are described as "major duties" in his job description, (doc. 21-4, p. 2), and Plaintiff has provided no further information, besides this lone sentence unsupported by citations, as to how this was not an essential function of his job. Moreover, "[t]he Eleventh Circuit has recognized that a law enforcement officer who is unable to perform a necessary task, even if that task makes up an indeterminately small portion of his work, may not be a qualified individual under the ADA." Heard, 2017 U.S. Dist. LEXIS 199548, at *28 (citing Holbrook v. City of Alpharetta, 112 F.3d 1522, 1527 (11th Cir. 1997)).

In sum, Plaintiff has failed to produce evidence that he was a qualified individual under the ADA at the time his employment was terminated.

**B.    Whether the City Failed to Provide a Reasonable Accommodation**

Plaintiff argues, even if his disability did prevent him from performing his job, he "could have performed those duties if provided a reasonable accommodation," but the City failed to provide one. (Doc. 25, p. 5.) An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability—unless doing so would impose undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). An accommodation is "reasonable," and thus required by the ADA, only if it enables the employee to perform the essential functions of the job. See LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998). Importantly, the

plaintiff bears the burden of identifying an accommodation and proving that the accommodation allows him to perform the job's essential functions.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997); Willis v. Conopco, Inc., 108 F.3d 282, 284 (11th Cir. 1997) (to request a reasonable accommodation "[a] plaintiff must establish that (a) he is handicapped but, (b) with reasonable accommodation (*which he must describe*), he is able to perform the 'essential functions' of the position he holds or seeks") (emphasis added). "Moreover, an employer's duty to provide a reasonable accommodation is not triggered unless a *specific* demand for an accommodation has been made." Frazier-White v. Gee, 818 F.3d 1249, 1255–56 (11th Cir. 2016) (emphasis added) (internal quotation omitted).

The regulations governing the ADA also explain that an employer may need "to initiate an informal, interactive process with the individual with a disability in need of an accommodation" to identify the person's limitations and potential reasonable accommodations that could overcome those limitations.  29 C.F.R. § 1630.2(o)(ii)(3).  But "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." Willis, 108 F.3d at 285; see also Frazier-White, 818 F.3d at 1257–58 ("[T]here is no basis for imposing liability on Defendant for failing to engage in an 'interactive process' to identify accommodations" where plaintiff does not identify a reasonable accommodation).  The Eleventh Circuit has stated that to demonstrate the accommodation is reasonable, the employee must, at a minimum, "identify [his] disability and suggest how the accommodation will overcome [his] physical or mental limitation." Owens v. Governor's Off. of Student Achievement, 52 F.4th 1327, 1334 (11th Cir. 2022).  The employee "must provide [his] employer enough information to assess how [the] proposed accommodation would help [him] overcome [his] disability's limitations," or, in other words, he must "link [his]

disability to [the] requested accommodation by explaining how the requested accommodation could alleviate the workplace challenges posed by [his] specific disability." Id. at 1335. Put simply, a plaintiff attempting to show his employer failed to provide an accommodation or engage in the interactive process must first identify a proposed accommodation *and* specifically demonstrate why that accommodation is reasonable. Plaintiff has failed to meet this burden.

The City argues that it did not fail to accommodate Plaintiff because he never requested a reasonable accommodation as required by the ADA. (Doc. 21-1, pp. 14–19.) Specifically, the City contends that Plaintiff never requested a specific period of leave, nor did he identify a specific accommodation to performing his duties in his current position.

### (1)    Additional Time for Leave of Absence

The Court turns first to Plaintiff's period of leave. "[B]ecause the ADA covers people who can perform their essential job functions in the present or immediate future, requests for indefinite leave so an employee can work 'at some uncertain point in the future' are inherently unreasonable." Monroe v. Fla. Dep't of Corr., 793 F. App'x 924, 927 (11th Cir. 2019) (quoting Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003)). In Wood v. Green, an employee who suffered from cluster headaches requested to take a leave of absence, but he could not give a specific date on which he would return. 323 F.3d at 1311. Weeks after taking his leave, he communicated with his employer that he was still suffering from cluster headaches, provided a doctor's note, and said he did not know when he could return. Id. His employer then terminated his employment. Id. On appeal, the Eleventh Circuit overturned the district court's finding that granting additional leave would have been a reasonable accommodation because the plaintiff "was not requesting an accommodation that allowed him to continue work in the present, but rather, in the future—at some indefinite time." Id. at 1314.

Here, Plaintiff took leave after suffering the effects of anxiety and PTSD. Plaintiff conveyed that he needed to take time off to get treatment because his condition was affecting his ability to perform his job. (Doc. 25-1, p. 3; <u>see</u> doc. 21-3, p. 10.) He provided a note from his doctor stating that in his current condition he was "unable to perform" his job functions because his "condition impair[ed] [his] ability to conduct traffic stops." (Doc. 21-4, p. 9.) Both Hankins and Bogden checked on Plaintiff throughout his leave, and Plaintiff consistently conveyed that he was still suffering from his disorders and did not know when he could return. Hankins specifically told Plaintiff that PPD policies required him to provide a doctor's clearance letter to return to work. Even so, Plaintiff did not provide such a letter. When Plaintiff's FMLA leave was up, Hankins again asked about Plaintiff's condition and whether he had a doctor's release. (Doc. 21-4, pp. 23–24.) Plaintiff responded that he did not have a release and that he had just had his medications adjusted, and he stated, vaguely, "Hopefully I can come back soon, I do miss it." (<u>Id.</u> at p. 22–24.) Hankins responded that, because of the expiration of Plaintiff's FMLA leave period, the City "will have to move forward with term[ination]," but expressly instructed him to stay in touch "should your physician allow[] you to return." (<u>Id.</u> at p. 22.)

As a preliminary matter, the Court has not seen any evidence that Plaintiff ever requested additional time off. Plaintiff has not pointed to any correspondence or statement showing he requested more time off while he continued to get treatment.[1] Even assuming Plaintiff somehow requested a longer period of leave, this still would not qualify as a reasonable accommodation. Plaintiff never gave any sort of timeline or indication of when or how he could resume his work

---

[1]  In his final conversation with Hankins on August 10, 2021, Plaintiff did not even object to her statement that, because of the expiration of his FMLA leave, his employment would have to be terminated. (<u>See</u> doc. 21-4, p. 22.) Rather, Plaintiff simply stated that he would "stay in touch with any information [he] received" and that "hopefully" he could return soon. (<u>Id.</u>) When Plaintiff was later asked about this interaction, Plaintiff admitted that he never asked Hankins, "at any point[,] to hold [his] job open until [he] [was] released to return to work." (Doc. 21-3, p. 18.)

responsibilities in the immediate future.[2]  (See generally doc. 21-4, pp. 19–24.)  Plaintiff and his doctors continuously conveyed that he could not yet return to work, and Plaintiff gave no indication that he may be able "to perform . . . [his] job duties in the present or in the immediate future."  Wood, 323 F.3d at 1314.  Such a request, assuming Plaintiff made one, would amount to a request for indefinite leave, which the City was not required to grant.  See Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997) ("[A]n employer did not violate the ADA by refusing to grant an employee a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions.") (alterations adopted) (internal quotations omitted); Carroll v. City of Stone Mountain, 544 F. App'x 926, 927–28 (11th Cir. 2013) (even assuming plaintiff made such a request, he did not set out a specific temporal limit on his absence and thus city was not required to give additional leave); Santandreu v. Miami Dade Cnty., 513 F. App'x 902, 906 (11th Cir. 2013) (plaintiff could not demonstrate a reasonable accommodation because he "had no way of knowing when his doctor would allow him to resume full-time work"); Wood, 323 F.3d at 1313–14 (even where there was some evidence that the leave of absence would likely not exceed two months, it was still a request for indefinite leave which employer was not required to grant).

---

[2]  Plaintiff summarily states that "Defendant understood Plaintiff only needed a couple of weeks," despite providing no record evidence to support such a contention.  (Doc. 25, p. 13.)  Plaintiff seemingly relies on a conversation he had with Bogden in which he stated that "*hopefully* in another week or two this medication will be full[y] operational."  (Doc. 21-4, p. 29 (emphasis added).)  With this statement, however, Plaintiff was not requesting additional time off from Bogden, and nothing in this statement reflects that Plaintiff was expected to be able to return to work at a definite time, which Plaintiff admits. (See doc. 21-3, p. 20 (admitting that he was not telling Bogden, "I can return to work on a date certain" and that he did not give Bogden a date when he could return).)  The Court does not find this lone, ambiguous statement sufficient to establish that Plaintiff requested leave.

### (2)    "Light Duty" Accommodation

Plaintiff also points to an alleged conversation he had with Haskins where "[he] think[s] [he] asked . . . Hankins about light duty."  (Doc. 25, pp. 11–12; doc. 21-3, p. 17.)  Assuming this is true, Plaintiff still fails to show he requested a reasonable accommodation.  As already mentioned, "the issue of whether an employee is an otherwise qualified individual and whether a reasonable accommodation can be made for that employee is determined *by reference to a specific position*."  <u>Duckett</u>, 120 F.3d at 1224–25 (emphasis added).  Plaintiff has produced no further evidence beyond this ambiguous discussion where the idea of light duty was perhaps raised.  He has not identified a specific position that he was qualified to do at the time and to which he specifically requested transfer, nor has he presented evidence that any such position was available.  This falls short of the specific accommodation request required by the Eleventh Circuit.  <u>See</u> <u>Frazier-White</u>, 818 F.3d at 1256  (plaintiff did not meet burden of establishing a reasonable accommodation where she only asked if there was an "option of . . . doing something else" but "did not support the request with any evidence that there was a specific, full-duty vacant position she was qualified for and could have done, given her medical condition"); <u>Willis</u>, 108 F.3d at 286 ("Plaintiff presented no competent evidence that any alternative position existed (vacant or otherwise)—regardless of whether she was qualified for it."); <u>see also</u> <u>Patterson v. City of Melbourne</u>, 669 F. Supp. 3d 1204, 1230–31 (M.D. Fla. 2023) (employer was not required to put plaintiff in a different position even where plaintiff identified two potential positions because plaintiff did not show that he was qualified for the position).  Indeed, according to the City, and unrebutted by Plaintiff, there were no light duty positions available to Plaintiff at the time his employment was terminated.[3]  (Doc. 25-1, p. 9; <u>see</u> doc. 21-7, p. 4); <u>McCollough v.</u>

---

[3]  According to Plaintiff, Hankins told him "[t]here were no light duty options available."  (Doc. 21-3, p. 18.)

Atlanta Beverage Co., 929 F. Supp. 1489, 1503 (N.D. Ga. 1996) ("Additionally, it is clear that defendant is under no obligation to create a light-duty position if none is available.").

Nevertheless, throughout his briefing, Plaintiff repeatedly argues that the City failed to offer a reasonable accommodation because "[it] never suggested the option of transferring to a different division." (Doc. 25, p. 7.) Plaintiff misunderstands his burden in establishing a prima facie case of discrimination. It is the *plaintiff's* burden, not the employer's, to establish an accommodation and its reasonableness. Willis, 108 F.3d at 284–86. While an employer has a duty to engage in interactive dialogue *following a reasonable accommodation request*, Plaintiff made no such request here. The evidence, at best, suggests that Plaintiff generally asked Hankins about light duty positions, and Hankins told him there were none available. There is simply no evidence on the record that Plaintiff had identified a specific reasonable accommodation that would have triggered the City's duty to engage in an interactive dialogue. Because Plaintiff has not shown evidence that he requested a reasonable accommodation, the City did not have to engage in the interactive process, and its failure to find an accommodation for Plaintiff does not amount to discrimination. Frazier-White, 818 F.3d at 1257–58.

### C.    The City Has Provided a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination, and Plaintiff has not Shown it Was Pretextual.

Moreover, even if the Court were to somehow find that Plaintiff had made a prima facie case of discrimination under the ADA, the City is still entitled to summary judgment because it has shown a legitimate, nondiscriminatory reason for terminating Plaintiff's employment and Plaintiff has failed to rebut that reason. Assuming a plaintiff establishes a prime facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action." Calvo v. Walgreens Corp., 340 F. App'x 618, 624 (11th Cir. 2009) (citing EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002)). The City argues

that Plaintiff's employment was terminated after the expiration of his FMLA leave because he failed to produce a doctor's note releasing him to return to work.  (Doc. 21-1, pp. 20–23.)

"An employee's failure to obtain a doctor's note clearing him . . . to return to work is a legitimate, non-discriminatory reason for an employer to prevent that employee from returning." Jones v. Georgia Ports Auth., No. 4:20-CV-315, 2022 WL 2990908, at *6 (S.D. Ga. July 28, 2022), aff'd, No. 22-12844, 2024 WL 470347 (11th Cir. Feb. 7, 2024) (citing Calvo, 340 F. App'x at 624); 42 U.S.C. § 12112(d)(4) (an employer may ask for medical documentation that is "shown to be job-related and consistent with business necessity" and "may make inquiries into the ability of an employee to perform job-related functions"); Calvo, 340 F. App'x at 624 ("Generally a doctor's refusal to release a person to return to work is a legitimate reason for an employer to prevent that person from returning to work.").  The City has thus met its burden of showing a non-discriminatory reason for Plaintiff's termination.

Once an employer meets its burden of presenting a legitimate, nondiscriminatory reason for its action, a plaintiff "must introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination." Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).  A plaintiff can make this showing by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, or by producing other evidence which permits the jury to reasonably disbelieve the employer's proffered reason." Calvo, 340 F. App'x at 624 (citing Brooks, 446 F.3d at 1163 and Steger v. General Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003)) (internal quotations omitted).  In sum, "[a]ny believable evidence which demonstrates a genuine issue of fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." Steger, 318 F.3d at 1079; Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304,

1310–11 (11th Cir. 2012) ("[The] inquiry is limited to whether the employer gave an honest explanation of its behavior.").

Plaintiff's attempted showing of pretext relies on (1) another employee whom he believes was afforded preferential accommodations, (2) an alleged comment by Hankins that it was "not a good idea" for Plaintiff to return, and (3) Hankins's testimony that Plaintiff still had PTO at the time of his dismissal.  (Doc. 25, pp. 20–23.)[4]

Turning first to the other employee, Plaintiff argues that, six months after he was fired, another PPD patrol officer, Ian Kenny, was diagnosed with cancer, was transferred to a desk job pending his surgery, went out on FMLA leave, and then was allowed to return to work.  (Id. at pp. 21–22.)  Even setting aside other differences between Plaintiff and Kenny that the City highlights,[5] Plaintiff's narrative still fails to challenge the City's proffered reason that employees are required to provide medical clearance to return to work at PPD.  Indeed, after the expiration of Kenny's FMLA leave, he resigned from his position, and was eventually allowed to come back to work *only after he provided medical documentation that he had been released to work*. (Doc. 21-9, p. 6.)  Kenny states that he even had to resubmit this documentation to comply with the City's standards, (id.), bolstering the City's position that this was a requirement for returning to work.  In Plaintiff's final communication with Hankins, he specifically conveyed that he still did not have a release from his doctor to return to work, and she instructed him to "stay in touch

---

[4]  As the City notes in its Reply brief, Plaintiff does not make a specific showing of pretext under the burden-shifting framework for his discrimination claim.  (Doc. 27, pp. 11–12; see generally doc. 25.) Plaintiff does, however, include a pretext section regarding his retaliation claim as well as an argument on the "convincing mosaic" standard.  (Doc. 25, pp. 20–23.)  Because the burden of showing pretext and a convincing mosaic of evidence require similar evidentiary showings, the Court construes Plaintiff's convincing mosaic argument to also serve as a rebuttal to the City's pretext argument.

[5]  Namely, the City emphasizes that Kenny specifically communicated with his chain of command about a temporary transfer pending surgery and that Kenny never was under a doctor's orders to not work.  (Doc. 27, pp. 10–11.)

should your physician allow[] you to return." (Doc. 21-4, pp. 22–23.) Plaintiff thereafter never reached out to Hankins nor did he obtain a release. Nothing about Kenny's case would lead to the inference that Hankins was dishonest about a release being required to return to work when the same requirement was imposed on Kenny. Cf. Calvo, 340 F. App'x at 624 (where plaintiff showed that employer previously accepted substantively comparable doctor's notes for another employee to return to work, her employer's rejection of her similar note raised an issue of fact on pretext).

The Court is likewise unpersuaded by Bogden's recollection that Hankins did not think it was a "good idea" for Plaintiff to return. Plaintiff had still not provided a release at the time Hankins allegedly made this statement; thus, the belief that it was not a "good idea" for Plaintiff to return would be consistent with City policy. Plaintiff fails to explain how this statement reflects a discriminatory animus against Plaintiff due to his PTSD rather than a remark on Plaintiff's failure to obtain a release to return to work. See, e.g., Jones, 2022 WL 2990908, at *11 (stray remark on plaintiff's condition was insufficient to show discriminatory animus).

Finally, Plaintiff points to Hankins's testimony that, when Plaintiff was terminated, he had remaining PTO but was not afforded additional leave time, which Plaintiff claims conflicts with the City's policy allowing employees to use PTO for medical leave. (Doc. 25, p. 19.) Even if the City deviated from its own policies here,[6] Plaintiff has failed to show how this suggests a discriminatory animus. While "[a]n employer's departure from its normal policies and procedures can, in some cases, serve as evidence of pretext," a plaintiff must establish that the

---

[6] It is not clear that the City actually deviated from its PTO policy. The deposition testimony, which Plaintiff cites in support of this contention, is where Hankins states that Plaintiff had "PTO left over" which was used to "[pay] for a portion of the medical deductions owed to the [C]ity." (Doc. 21-7, p. 15.) She also stated that employees are allowed to use PTO during a waiting period before short-term disability leave but there is no waiting period for FMLA leave. (Id. at pp. 12, 15.)

"deviation from policy occurred in a discriminatory manner." Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 829 (11th Cir. 2019); id. ("[M]ere failure to follow operating procedures, without more, does not necessarily suggest that an employer was motivated by illegal discriminatory intent or that its proffered reason for termination was pretextual.") (citing Mitchell v. USBI Co., 186 F.3d 1352, 1355–56 (11th Cir. 1999)).  There is no evidence that this policy was only afforded to individuals without disabilities (or with different disabilities), that this was a benefit afforded to other employees but denied to Plaintiff, or that Plaintiff actually requested to use his PTO in the first place.  Put simply, Plaintiff has failed to show any evidence that the City's deviation from its PTO policy (if such a deviation occurred), was motivated by discriminatory animus.  See Jones, 2022 WL 2990908, at *9 ("[E]ven if [defendant] had deviated from its own policies in handling Plaintiff's Return-to-Work Letter . . . Plaintiff failed to show anything more that suggests that [defendant's] deviation from its own policy (assuming that deviation happened) occurred in a discriminatory manner.").

Plaintiff has failed to produce evidence tending to show that the City's stated reason for Plaintiff's termination was dishonest.  In other words, Plaintiff has failed to produce evidence that demonstrates "such weakness[ ], implausibilit[y], inconsistenc[y][,] or contradiction[ ]" that a reasonable fact finder could find the City's reason "unworthy of credence."[7]  Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1348 (11th Cir. 2007).

---

[7]  For the same reasons the Court finds Plaintiff's pretext argument unavailing, so too does it find that Plaintiff has not produced evidence of a "convincing mosaic" of circumstantial evidence.  Under a general convincing mosaic approach, a plaintiff can survive summary judgment "if he presents circumstantial evidence that creates a triable issue concerning the employer's . . . intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  Plaintiff has identified no facts showing the City's discriminatory intent and provides no further argument as to why a convincing mosaic approach would overcome the City's Motion.  (See generally doc. 25, pp. 20–23.)

Accordingly, absent any evidence that Plaintiff was a qualified individual or made a specific request for an accommodation, and in light of the City's stated legitimate, nondiscriminatory reason which Plaintiff has failed to rebut, the Court **GRANTS** the City's Motion for Summary Judgment on Plaintiff's claim of disability discrimination under the ADA (Count I).

## II.    ADA Retaliation Claim

The City also moves for summary judgment on Plaintiff's claim of ADA retaliation (Count II) on similar grounds.  (Doc. 21-1, pp. 23–24.)  The ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA.  Frazier-White, 818 F.3d at 1258 (citing 42 U.S.C. § 12203(a)).  To make an ADA retaliation claim, "Plaintiff must show that: (1) [he] engaged in a statutorily protected expression, (2) [he] suffered an adverse employment action, and (3) there was a causal link between the two."  Id.  "The first element may be met by a request for a reasonable accommodation."  Id.  "The third element requires a showing of but-for causation."  Id.  Like the discrimination context, if an employee establishes a prima facie case of retaliation, the burden shifts to his employer to articulate a legitimate, non-retaliatory reason for the challenged action.  Jones v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 1261, 1271 (11th Cir. 2017).  If the employer does so, the burden shifts back to the employee who "must show that the supposedly legitimate reason was in fact a pretext designed to mask illegal [retaliation]."  Id.

Plaintiff argues that he engaged in a protected activity by "communicat[ing] with Haskins regarding his disability and his need for an accommodation."  (Doc. 25, p. 15.)  Curiously, Plaintiff failed to identify specific evidence demonstrating this accommodation request.  (See generally id.)  As a threshold matter, the Court's previous determination that Plaintiff never

requested a reasonable accommodation is fatal to Plaintiff's prima facie case of retaliation because he thus has not shown he engaged in a protected activity.  See supra, Section I.B; Connelly, 758 F. App'x at 832 ("[Plaintiff's] claim that [her employer] retaliated against her in violation of the ADA for requesting a reasonable accommodation fails because, as already explained, [plaintiff] never requested an accommodation.").

Even assuming Plaintiff did make such a request, Plaintiff has failed to demonstrate that the City's proffered reason for his termination was mere pretext.  As discussed, supra, Discussion Section I.C, the City has provided ample evidence that Plaintiff's termination was due to his failure to provide a medical release to return to work upon the expiration of his FMLA leave.  Plaintiff additionally argues that there is evidence of pretext to support his retaliation claim because he communicated to Hankins that he "need[ed] to continue his leave," and, "[t]he same day, Hankins advised Plaintiff that he was terminated."  (Doc. 25, p. 17.)  While temporal proximity can be considered in a pretext analysis, temporal proximity alone is not enough to survive summary judgment.  Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1137 n.15 (11th Cir. 2020).  Plaintiff does not contest that his FMLA leave had expired on the day he was terminated, nor does he contest that, as of that date, he still had not provided the City with a release to return to work.  Put simply, Plaintiff's reliance on temporal proximity does nothing to cast doubt on the City's proffered reason for his termination because the City's stated reason for the termination is supported by the conditions on the date of Plaintiff's termination (i.e., the expiration of his leave and his failure to provide a release to work).  Connelly, 758 F. App'x at 832 ("Although close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection, this evidence serves only to establish [plaintiff's] prima

facie case of retaliation . . . .  It does not rebut [defendant's] legitimate, non-discriminatory reason for [plaintiff's] termination.") (internal quotations and citations omitted); <u>Frazier-White</u>, 818 F.3d at 1258 ("no evidence to support causation" where "all of the evidence in the record shows that Plaintiff was terminated solely as the result of her inability to return to full duty at the expiration of her eligibility for light-duty status").

Because Plaintiff has failed to produce evidence that he requested reasonable accommodation that motivated the City to terminate his employment, Plaintiff cannot support an ADA Retaliation claim.  Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment on Plaintiff's ADA Retaliation claim (Count II).

## III.    Punitive Damages and Attorney's Fees

Finally, the City moves for summary judgment on Plaintiff's claims for punitive damages and attorney's fees "since [Plaintiff] has no sustainable cause of action."  (Doc. 21-1, p. 24.) Under federal law, punitive damages are not recoverable against a municipality in employment discrimination cases.   42 U.S.C. § 1981a(b)(1) (punitive damages unavailable against "a government, government agency or political subdivision"); <u>see, e.g.</u>, <u>Hoskins v. City of Atlanta</u>, No. 1:07-CV-2347-BBM, 2009 WL 10666090, at *10 (N.D. Ga. Mar. 23, 2009) (punitive damages unavailable against city for an ADA claim).  Additionally, because he has not submitted evidence sufficient to survive summary judgment on any of his underlying claims, his request for attorney's fees likewise cannot survive.  Under the ADA, attorney's fees may be afforded to "the prevailing party."  42 U.S.C. § 12205.  With no remaining claims to which Plaintiff could attach his claims for punitive damages or attorneys' fees, the Court **GRANTS** the City's Motion for Summary Judgment on those claims.

**CONCLUSION**

In sum, Plaintiff has failed to raise a genuine issue of material fact that his employment was terminated because of his disability or because he requested an accommodation in violation of the ADA.  Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment on all counts.  (Doc. 21.)  With no further claims remaining, the Court **DIRECTS** the Clerk of Court to **ENTER** the appropriate judgment and to **CLOSE** this case.

**SO ORDERED**, this 12th day of August, 2024.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA